No. 03-062

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 205

THE MORTGAGE SOURCE, INC.,

Plaintiff and Respondent,

v.

HERBERT STRONG,

Defendant and Appellant.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DV 00-453,
Honorable Ted O. Lympus, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

James C. Bartlett, Attorney at Law, Kalispell, Montana

For Respondent:

Erika Johnson, Johnson, Berg, McEvoy and Bostock, Kalispell, Montana

Submitted on Briefs:  June 26, 2003

Decided:  August 12, 2003

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1      Herbert Strong (Strong) appeals from the District Court's order enforcing a brokerage contract and a promissory note between Strong and The Mortgage Source, Inc. (TMS), and awarding TMS its attorney fees of over $5,000.00.  We affirm.

¶2      The sole issue on appeal is: Did the District Court err in enforcing the promissory note and brokerage contract between Strong and TMS and awarding TMS attorney fees?

Factual and Procedural Background

¶3      On December 15,1999, Strong entered TMS's place of business and requested that the mortgage brokers assist him in securing a mortgage on his home.  At that time, Deanna McAtee (McAtee), owner of TMS, had Strong provide her with his financial background.  She typed his information into TMS's computerized program used for preparing loan packages.  Based on this verbal information, McAtee prepared a loan package for submission to various lenders.  McAtee also informed Strong that his home would have to be re-appraised because its current appraisal was more than six months old and could not be used for loan purposes.  Although the potential borrower usually pays for an appraisal of his or her residence, Strong indicated to McAtee that he did not have the money for a new appraisal and McAtee, on behalf of TMS, agreed to lend him $425.00 for the appraisal fee.  The parties executed a promissory note for $425.00.  The parties agreed that, if possible, the appraisal fee would be rolled into the loan and TMS would receive payment from the lender, but if Strong failed to consummate a loan transaction with a lender, Strong himself would pay the note.

2

¶4     Strong does not dispute that TMS provided him with the application materials, disclosures required by state and federal law, and a Mortgage Brokerage Business Contract (brokerage contract). This document outlined the employment relationship between Strong and TMS, TMS's obligation to provide services in securing a loan commitment for Strong, and Strong's obligation to pay for brokerage services regardless of whether he actually consummated a transaction with a lender. Strong signed the brokerage contract in late December 1999; TMS did not sign it. Both the brokerage contract and the promissory note provide for the payment of attorney fees and costs to the prevailing parties in the event of litigation.

¶5     Over the next few months, TMS discovered that Strong's financial situation was not as he initially represented, and it was not until TMS received Strong's credit report that it discovered that Strong's liabilities were greater than he reported to McAtee in December 1999. For example, Strong had failed to inform TMS of rental property that he owned in Valier, Montana, and that the property was encumbered by first and second mortgages. Furthermore, the appraisal of Strong's residence revealed that it had a market value of $21,000.00 less than Strong had relayed to McAtee at the December 1999 meeting. Because of this new information, TMS, on two more occasions, was required to complete new application materials and disclosures to reflect the true financial status of Strong. Given the lower appraisal value of his property and Strong's poor credit history and rating, TMS was limited to finding nonconforming, high risk loans for Strong. TMS determined that lender MetWest offered the best terms; MetWest issued a Truth in Lending Disclosure to Strong

3

offering a principal loan of $44,608.79 with an interest rate of 12.796 percent. Strong entered into the agreement with MetWest; however, he effectively rescinded pursuant to the three-day right of rescission as provided by Regulation Z. After Strong rescinded the MetWest mortgage, TMS sent him a bill for its brokerage fee and out of pocket expenses incurred in securing a loan commitment for him as provided by the brokerage contract and promissory note. Strong refused to pay TMS.

¶6 In April 2000, TMS filed a complaint in Justice Court to enforce the promissory note and brokerage contract. At trial, TMS sought the following fees: Commitment Fee ($500.00); Application Processing Fee ($350.00); Appraisal Fee ($425.00); Credit Report Fees ($50.00); and Courier Fees ($30.00). Strong answered the Complaint and alleged that he was excused from performance because TMS failed to perform. Both parties appeared *pro se* at a Justice Court trial and the court entered judgment for TMS for its contract damages of $ 1,353.33 and court costs of $ 68.60. Strong appealed the Justice Court decision to District Court, which awarded TMS $930 plus 10 percent interest in contract damages and its attorney fees of over $5,000.00. Strong appeals the District Court's ruling.

### Standard of Review

¶7 We review a district court's findings of fact to determine whether they are clearly erroneous. *See Daines v. Knight* (1995), 269 Mont. 320, 324, 888 P.2d 904, 906; *see also* Rule 52(a), M.R.Civ.P. We have adopted a three-part test for determining whether a district court's findings of fact are clearly erroneous. *See Daines,* 269 Mont. at 325, 888 P.2d at 906. The test requires that: (1) we determine whether the findings are supported by

4

substantial evidence; (2) if the findings are supported by substantial evidence, then we must determine whether the evidence was misapprehended by the court; and (3) if the court's findings are supported by substantial evidence that has not been misapprehended by the court, then we may still determine that the finding is clearly erroneous if we are left with a firm conviction that a mistake has been made after reviewing the record. *See Daines,* 269 Mont. at 325, 888 P.2d at 906 (citing *Interstate Production Credit Ass'n v. DeSaye* (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287).

¶8     When reviewing a court's conclusions of law, we review them to determine whether the court's interpretation of the law is correct.  *See Anderson v. Werner Enterprises, Inc.,* 1998 MT 333, ¶ 24, 292 Mont. 284, ¶ 24, 972 P.2d 806, ¶ 24 (citing *Carbon County v. Union Reserve Coal Co., Inc.* (1995), 271 Mont. 459, 469, 898 P.2d 680, 686).  Our standard of review of a trial court's order granting or denying attorney fees and costs is whether the court abused its discretion. *Lewistown Propane Co. v. Moncur*, 2002 MT 349, ¶ 19, 313 Mont. 368, ¶ 19, 61 P.3d 780, ¶ 19.

Discussion

¶9     Strong argues that federal law protects a consumer from being liable for any fees associated with a credit transaction that is rescinded within three days, including a mortgage broker's fees.  Strong claims that the following excerpts from the Truth in Lending Act (TILA) and its regulations protect him from being liable to TMS for its services.

> When an obligor exercises his right to rescind under subsection (a) of this section, <u>he is not liable for any finance or other charge</u>, and any security

5

interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission.

16 U.S.C. § 1635(b) (TILA) (emphasis added).

¶10    Regulation Z, 12 C.F.R. § 226.23 provides:

(d) Effects of rescission. (1) When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any amount, including any finance charge. [Emphasis added.]

Strong maintains that the plain meaning of the language in the code and regulation control. According to Strong, Regulation Z, which states that a consumer who rescinds "shall not be liable for any amount," includes any amount due for services of a mortgage broker. Strong argues that a "mortgage broker has no state remedy when no federal remedy is given," and that TMS's "back door" efforts to enforce the promissory note and brokerage contract is forbidden by law. Strong also contends that the brokerage contract is not binding because it was not signed by TMS.

¶11    TMS argues on appeal that the District Court correctly applied Montana contract law in enforcing the promissory note and brokerage contract against Strong. TMS maintains that Strong's argument, although not explicit, is essentially that federal law preempts state law in this instance.

¶12    After reviewing both parties' arguments and relevant law, we conclude that neither the TILA nor Regulation Z excuse Strong from his obligations to TMS for the appraisal and service fees. Although Regulation Z, specifically, 12 CFR § 226.15(d) and § 226.23(d), provide that the consumer "shall not be liable for any amount, including any finance charge"

6

upon rescission, the "any amount" language only applies to the loan transaction with the creditor, here MetWest, not to third parties such as TMS. While it is correct that the federal code protects Strong from paying any fees to the lender, these laws do not address arrangements between a borrower and a mortgage broker. In fact, portions of Regulation Z, 12 CFR § 226.4(a)(1) and (c), expressly exclude appraisal and service fees from the definition of "finance charge."

¶13 This interpretation is in line with the policy behind the TILA and Regulation Z. According to Regulation Z itself, its purpose is to ensure the meaningful disclosure of credit terms and costs of credit so that consumers can compare the costs of credit among various lenders. Another purpose of the TILA and Regulation Z is to prevent the borrower from unwittingly allowing a lien to be placed on his principal residence in exchange for credit. The TILA and Regulation Z allow consumers the right to cancel certain credit transactions secured by the consumer's principal residence within three days of consummating the loan transaction; however, as the District Court noted "[t]he right of cancellation is designed to relieve the borrower of the lien placed on his home by the <u>creditor</u> and all obligations owed to the <u>creditor</u>," the creditor being MetWest, not TMS.

¶14 We find that Strong's contention that the TILA and Regulation Z protect him from liability for the fees and costs of a mortgage broker in the event of rescission, is unreasonable. Strong's literal interpretation penalizes mortgage brokers for servicing loans for a customer such as Strong. Under Strong's argument, a mortgage broker would never be able to collect its fees and costs when, through no fault of its own, the loan transaction is not

consummated. As for Strong's claim that the brokerage contract is not enforceable because TMS did not sign the document, Strong did not present this argument to the District Court. Consequently, we decline to reach this issue as it was not properly preserved for appeal. This Court will not consider an issue that is not raised before the district court because it is unfair to fault the court on an issue it was never given an opportunity to consider. *See State v. Knox*, 2001 MT 232, ¶ 3, 307 Mont. 1, ¶ 3, 36 P.3d 383, ¶ 3.

¶15 Therefore, we affirm the District Court's decision that the promissory note and brokerage contract between Strong and TMS are enforceable. Even though Strong effectively rescinded the mortgage with the lender, his rescission does not affect or alter his obligations to TMS pursuant to the promissory note and the brokerage contract. We also affirm the District Court's award of attorney fees and award TMS reasonable attorney fees on appeal, with the amount to be determined by the District Court.

¶16 Affirmed and remanded for proceedings consistent with this Opinion.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ KARLA M. GRAY
/S/ JIM REGNIER
/S/ PATRICIA COTTER
/S/ JIM RICE